Paul JUNG, M.D., et al., Plaintiffs,

v.

ASSOCIATION OF AMERICAN
MEDICAL COLLEGES, et
al., Defendants.

No. CIV.A.02–0873 PLF.

United States District Court,
District of Columbia.

Aug. 12, 2004.

Ann D. White, Michael J. Kane, Mager White & Goldstein LLP, Jenkintown, PA, David E. Romine, Donald L. Perelman, Roberta D. Liebenberg, Fine, Kaplan and Black R.P.C., Philadelphia, PA, Mark A. Griffin, Raymond J. Farrow, Keller Rohrback LLP, Seattle, WA, Megan E. Jones, Michael Hausfeld, Christopher J. Cormier, Richard A. Koffman, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Michael J. Freed, Much, Shelist, Freed, Denenberg, Arnent & Rubenstein, PC, Sherman Paul Marek, Law Office of Sherman Marek, P.C., Chicago, IL, Susan B. White, Freedman Boyd Daniels Hollander Goldberg & Cline, P.A., Albuquerque, NM, for Plaintiffs.

Robert A. Burgoyne, Caroline M. Mew, Frederick Robinson, Fulbright & Jaworski LLP, Paul W. Kim, Blank Rome LLP, Frank R. Volpe, Sidley Austin Brown & Wood, Alicia Joyce Batts, Foley & Lardner, Stephen C. Leckar, Butera & Andrews, Paul A. Kaplan, Womble Carlyle Sandridge & Rice PLLC, Adrian Wager–Zito, Jones, Day, Reavis & Pogue, John E. Hall, Derek Ludwin, James R. Atwood, Covington & Burling, John David Taurman, Vinson & Elkins LLP, Kerry Alan Scanlon, Nicole Jelani Becton, Kay Scholer LLP, Edward Marcellus Williamson, Stephen J. Spiegelhalter, Latham & Watkins, Christopher H. Gordon, Squire, Sanders &

Dempsey, LLP, James Harris Sneed, Nicholas R. Koberstein, McDermott, Will & Emery, Fernando R. Laguarda, Mintz & Levin, Gerard P. Finn, Nora Cregan, Bingham McCutchen, LLP, Robert Stephen Bennett, Skadden, Arps, Slate, Meagher & Flom LLP, Amy L. Bess, Sonnenschein Nath & Rosenthal, Carol Elder Bruce, Tighe Patton Armstrong Teasdale PLLC, Stephen M. Axinn, Axinn, Veltrop & Harkrider LLP, Washington, DC, Peter · Koch, Thomas Campbell, Gardner, Carton & Douglas, Roxane C. Busey, Jack R. Bierig, Sidley Austin Brown Wood, Shanna S. Williams, William K. McVisk, Johnson & Bell, Ltd., Gregory G. Wrobel, Vedder, Price, Kaufman & Kammholz, Stephen Jay Landes, Wildman, Harrold, Allen & Dixon, Chicago, IL, David B. Hamilton, Ober, Kaler, Grimes & Shriver, Baltimore, MD, Peter A. Barile, III, Kaye Scholer LLP, New York, NY, J. Thomas Rosch, Lathan & Watkins, Los Angeles, CA, Claudia Y. Sanchez, Bingham McCutchen, LLP, San Francisco, CA, for Defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court for consideration of Defendants' Motion for Judgment on the Pleadings. Plaintiffs in this putative class action are medical school graduates currently or formerly enrolled in resident physician "residency" programs. The defendants can be categorized into two groups: the organizational defendants (organizations and associations that participate in the administration of graduate medical education in the United States) and the institutional defendants (universities, medical schools, foundations, hospitals, health systems and medical centers that sponsor medical residency programs). Plaintiffs filed suit charging that the defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifical-

ly, plaintiffs allege that the defendants have contracted, combined and conspired among themselves to "displace competition in the recruitment, hiring, employment and compensation of resident physicians, and to impose a scheme of restraints which have the purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident physician compensation and other terms of employment." Complaint ("Compl.") ¶ 2.

On February 11, 2004, the Court issued an Opinion and Order addressing certain defendants' motions to dismiss this action on various grounds. *See Jung v. Association of American Medical Colleges*, 300 F.Supp.2d 119 (D.D.C.2004) ("February 11 Opinion and Order"). After the Court issued this Opinion and Order, Congress enacted and President George W. Bush signed into law the Pension Funding Equity Act of 2004, Pub.L. No. 108–218, 118 Stat. 596 (2004), which includes a provision entitled "Confirmation of Antitrust Status of Graduate Medical Resident Matching Programs," an amendment to the antitrust laws that has been codified as 15 U.S.C. § 37b. Certain defendants now move under Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings on the ground that the action must be dismissed in light of this new legislation which creates or confirms an antitrust exemption for graduate medical education residency matching programs.

## I. BACKGROUND

### A. Plaintiffs' Allegations

In their class action complaint in this case, plaintiffs assert that there are three intertwining prongs to the antitrust conspiracy they allege. The first prong of the alleged conspiracy concerns the annual assignment of fourth-year medical students to the institutional defendants' residency

programs by the National Resident Matching Program ("NRMP"). The NRMP, an Illinois not-for-profit corporation, is managed and operated by defendant American Association of Medical Colleges ("AAMC") from AAMC's principal office in Washington, D.C. *See* Compl. ¶ 15. The AAMC also is an Illinois not-for-profit corporation, whose membership includes all 125 accredited medical schools, including those medical schools named in the complaint, and approximately 375 major teaching hospitals and health systems, some of which also are named in the complaint. These hospitals and health systems are member hospitals of a subsection of the AAMC, the Council of Teaching Hospitals and Health Systems ("COTH") Section. *See id.* ¶ 17.

Plaintiffs further allege that in order to effectuate the assignment, or the "Match," as it is commonly called, prospective medical residents enter into contracts with and submit to the NRMP a ranked list of desired medical resident positions with various institutions ("Student Match Contract"). The institutions themselves also enter into contracts with the NRMP and submit ranked lists of the medical students whom they are interested in hiring ("Institutional Match Contract"). On a date certain, the NRMP through an algorithm "matches" the students' lists against the institutions' rankings, resulting in the assignment of each prospective medical resident to one residency program. *See* Compl. ¶¶ 15, 83–86. Plaintiffs allege that this system eliminates a free and competitive market and substitutes a centralized, anticompetitive allocation system that assigns prospective resident physicians to a single, specific and mandatory residency program. Plaintiffs further allege that the defendants designed and implemented this system and collectively agreed to comply with it in violation of the antitrust laws. *See id.* ¶ 83.

Several specific features of this assignment system allegedly serve to impose anticompetitive restraints on medical residency hiring. Plaintiffs allege that a medical student is required to enter into the Match if he or she wishes to gain employment in a residency program accredited by defendant Accreditation Council for Graduate Medical Education ("ACGME"). *See* Compl. ¶ 71. An individual's participation in an ACGME-accredited residency program in turn allegedly is a prerequisite for specialty certification by a member board of defendant American Board of Medical Specialties ("ABMS"), an Illinois not-for-profit corporation consisting of 24 recognized medical specialty certification boards, upon completion of the residency. *See id.* ¶¶ 20, 69. Plaintiffs allege that eventual specialty certification by an ABMS board is considered critical to prospective residents inasmuch as they desire to be "certified" to practice within a specialty following the completion of their residencies. The practical effect of this structure, plaintiffs charge, is that the vast majority of medical students are compelled to participate in the Match, which is a substitute for all aspects of competitive individual negotiations and requires applicants to commit contractually to any assigned position as a condition of enrolling in the Match Program. *See id.* ¶¶ 69, 86. Furthermore, certain implementing policing mechanisms of the Match allegedly compel compliance with the foregoing restraints. These alleged mechanisms include the requirement that program participants immediately report suspected policy violations to the NRMP and advise the relevant organizational authorities of institution or resident physician violations. *See id.* ¶ 86(c).

In the second prong of the alleged conspiracy, plaintiffs assert that certain aspects of the aforementioned ACGME accreditation standards, with which the

institutional defendants allegedly voluntarily comply, function to further restrict residency employment. Specifically, plaintiffs allege that the ACGME (1) has the authority to regulate the number of employment positions in a residency program; (2) imposes substantial obstacles to the ability of a resident to transfer employment from one employer to another during the period of a residency, thereby effectively making NRMP assignments permanent for the duration of a residency; (3) encourages and/or requires participation in the Match by an institution as a condition of accreditation; and (4) directly reviews compensation and other terms of employment with the purposes of fixing and depressing them. *See* Compl. ¶ 88.

The third prong of the alleged conspiracy concerns the exchange by defendants of information on resident compensation and other terms of employment through surveys and databases that plaintiffs allege has the purpose and effect of standardizing and stabilizing compensation and other terms of employment. *See* Compl. ¶¶ 73–82. This exchange allegedly occurs in two ways. First, the AAMC annually surveys members of its COTH Section seeking compensation levels for the employment year, aggregates the results into various categories and distributes its findings in an annual report (the "COTH Survey" or "Survey"). *See id.* ¶¶ 74–79. Second, hospitals and health systems access similar information through an electronic database known as the Fellowship and Residency Electronic Interactive Database ("FREI-DA"), which is maintained by defendant American Medical Association ("AMA"). *See id.* ¶ 80. Plaintiffs allege that this exchange of information allows institutional defendants to fix resident salaries and benefits each year at depressed, anticompetitive levels.

Plaintiffs charge that the execution of the Match program, the enforcement of the ACGME-accreditation standards, and the coordinated collection and distribution of residency program compensation information together produce a significant depression of residents' salaries and working conditions by removing residents' ability to achieve enhanced salaries and working conditions through competition. *See* Compl. ¶¶ 92–96. Plaintiffs allege that defendants have violated Section 1 of the Sherman Act by contracting, combining and conspiring to unreasonably restrain trade and commerce. Plaintiffs filed this antitrust action as a proposed class action and have moved to certify both plaintiff and defendant classes. *See* Motion for Class Certification, filed November 3, 2003.

## B. The February 11 Opinion and Order

In its February 11 Opinion and Order, the Court (1) denied certain institutional defendants' motion to dismiss for lack of personal jurisdiction; (2) granted the motion to dismiss for lack of personal jurisdiction of defendants Washington University Medical Center, the American Board of Medical Specialties and the Council of Medical Specialty Societies; (3) denied defendant National Resident Matching Program's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure and its motion to compel arbitration, and denied the motion to compel arbitration filed by the American Medical Association; (4) denied the motions to dismiss for failure to state a claim upon which relief can be granted filed by the Association of American Medical Colleges and the Accreditation Council for Graduate Medical Education; and (5) granted the motions to dismiss for failure to state a claim filed by the American Hospital Association, the

American Medical Association and Yeshiva University.

Specifically, the Court first concluded that it had personal jurisdiction over certain institutional defendants under the "conspiracy theory" of personal jurisdiction. The Court found that plaintiffs adequately had alleged "a conspiracy to depress resident compensation between, *inter alia,* those institutional defendants that participated in the Match and the NRMP" and that certain acts in furtherance of the conspiracy had taken place in the District of Columbia. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 142. The Court further concluded that it did not have personal jurisdiction over those moving defendants that plaintiffs had not adequately alleged participated in the conspiracy. *See id.* at 143. Second, the Court denied defendant NRPM's motion to compel arbitration of those elements of the conspiracy claim that concerned the Match, concluding that the Supreme Court's decision in *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and its progeny manifested "a clear and compelling countervailing interest in the comprehensive adjudication of conspiracy claims brought under the Sherman Act." *Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 156. The Court denied the motion of the American Medical Association to compel arbitration on similar grounds. *See id.*

Third, the Court denied the motions to dismiss for failure to state a claim filed by the Association of American Medical Colleges and the Accreditation Council for Graduate Medical Education, concluding

that "plaintiffs adequately have alleged a common agreement to displace competition in the recruitment, hiring, employment and compensation of resident physicians and to impose a scheme of restraints that has the purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident physician compensation and other terms of employment among certain defendants" and that the moving defendants participated in that conspiracy. *Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 173–74. In considering the Rule 12(b)(6) motions, the Court assessed the conspiracy allegations holistically rather then parsing out and considering those allegations that expressly related to the individual moving defendants. *See id.* at 160–61 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. at 699, 82 S.Ct. 1404, and *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).[1]

### C. The New Legislation

On April 10, 2004, President Bush signed into law the Pension Funding Equity Act of 2004, Pub.L. No. 108–218, 118 Stat. 596 (2004), which includes Section 207 entitled "Confirmation of Antitrust Status of Graduate Medical Resident Matching Programs," now codified as 15 U.S.C. § 37b ("Section 207"). At its core, Section 207 provides that "[it] shall not be unlawful under the antitrust laws to sponsor, conduct, or participate in a graduate medical education residency matching program, or to agree to sponsor, conduct, or participate in such a program." 15 U.S.C. § 37b(b)(2) (the "substantive" provision). In addition, the statute provides that "[e]vidence of any of the conduct described in the preceding sentence shall not be admissible in Federal

---

1. The Court concluded that plaintiffs failed to allege adequately that defendants AHA, AMA and Yeshiva University participated in the conspiracy. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 173–74.

court to support any claim or action alleging a violation of the antitrust laws." *Id.* (the "evidentiary prohibition"). The stated purposes of the law are to "confirm that the antitrust laws do not prohibit sponsoring, conducting, or participating in a graduate medical education residency matching program, or agreeing to do so; and ... [to] ensure that those who sponsor, conduct or participate in such matching programs are not subjected to the burden and expense of defending against litigation that challenges such matching programs under the antitrust laws." 15 U.S.C. § 37b(a)(2)(A)-(B). Section 207 creates a price-fixing exemption for a certain class of antitrust claims, providing that "[n]othing in this section shall be construed to exempt from the antitrust laws any agreement on the part of 2 or more graduate medical education programs to fix the amount of the stipend or other benefits received by students participating in such programs." 15 U.S.C. § 37b(b)(3).

Section 207 took effect on April 10, 2004, and applies "to conduct whether it occurs prior to, on, or after such date of enactment" and "to all judicial and administrative actions or other proceedings pending on such date of enactment." 15 U.S.C. § 37b(c). Defendants argue that judgment must be entered on their behalf because Section 207 precludes plaintiffs from pursuing their claim in light of the Court's conclusion in the February 11 Opinion and Order that plaintiffs allege a single overarching conspiracy with three interrelated prongs with the Match program at its center. Section 207 requires this conclusion, defendants argue, both by expressly exempting the Match program and its participants from the antitrust laws and by forbidding the consideration of evidence related to any entities' sponsorship, conduct, or participation in a graduate medical education residency matching program, or agreement to sponsor, conduct,

or participate in such a program, in support of any antitrust claim. *See* Defendants' Motion for Judgment on the Pleadings ("Defs.' Mot.") at 5–6. Defendants further argue that the legislation expressly applies to this action and that the "price-fixing" clause does not save plaintiffs' claim. *See id.* at 6–7.

## II. DISCUSSION

### A. Procedural Posture of Defendants' Motion

Plaintiffs first argue that defendants' motion for judgment on the pleadings is premature because fifteen of the moving defendants have not yet answered the complaint. *See* Plaintiffs' Response Opposing Defendants' Rule 12(c) Motion for Judgment on the Pleadings ("Pls.' Opp.") at 2–3. Rule 12(c) of the Federal Rules of Civil Procedure states that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). This argument must fail, however, because if a party files a Rule 12(c) motion before its answer, the Court may treat it as a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *See Dale v. Executive Office of the President*, 164 F.Supp.2d 22, 24 (D.D.C.2001) (citing *Seber v. Unger*, 881 F.Supp. 323, 325 n. 2 (N.D.Ill.1995)); *Moran v. Peralta Community College Dist.*, 825 F.Supp. 891, 894 (N.D.Cal.1993) (considering Rule 12(c) motion even though all defendants had not yet answered because otherwise plaintiff could avoid Rule 12(c) motion simply by not serving one defendant).

No prejudice to any party results from treating a Rule 12(c) motion as a Rule 12(b)(6) motion because the standard of review for motions for judgment on the pleadings under Rule 12(c) of the Federal

Rules of Civil Procedure is essentially the same as that for motions to dismiss under Rule 12(b)(6). *See Ramirez v. Dep't of Corrections,* 222 F.3d 1238, 1240–41 (10th Cir.2000); *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987); *Transworld Products Co. v. Canteen Corp.,* 908 F.Supp. 1, 2 (D.D.C.1995). On either motion, the Court may not rely on facts outside the pleadings and must construe the complaint in the light most favorable to the non-moving party. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). Granting judgment on the pleadings pursuant to Rule 12(c) or a motion to dismiss for failure to state a claim under Rule 12(b)(6) is warranted only if it appears beyond doubt, based on the allegations contained in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Alicke v. MCI Communications Corp.,* 111 F.3d 909, 912 (D.C.Cir.1997).

■ Fourteen of the moving defendants have filed answers.[2] The remaining 15 movants have not filed an answer or a motion to dismiss pursuant to Rule 12(b)(6). Although certain defendants in this latter group filed motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2), such motions do not preclude them from later filing motions to dismiss for failure to state a claim. *See* FED. R. CIV. P. 12(g) ("If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised

by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, *except a motion as provided in subdivision (h)(2) hereof on any of the grounds there stated.*") (emphasis added). Rule 12(h)(2) expressly mentions a motion to dismiss for failure to state a claim.

Based on the foregoing authorities, the Court concludes that it is appropriate for it to proceed with consideration of defendants' motion under Rule 12(c) for those defendants that have answered the complaint and under Rule 12(b)(6) for those defendants that have not. The motion is not premature as to any defendant.

### B. *The Impact of Section 207*

■ Defendants first argue that "Congress has now made clear through Section 207 that it is not unlawful under the antitrust laws to sponsor, conduct, or participate in the Match or to agree to sponsor, conduct or participate in the Match." Defs.' Mot. at 6. While that may be true, that alone is insufficient because plaintiffs do not allege in their complaint that the existence of and/or participation in the Match is a *per se* violation of the antitrust laws. Instead, plaintiffs argue that the Match, in combination with the dissemination of the COTH Survey and the enforcement of the ACGME accreditation standards, functions to suppress competition in resident hiring and compensation, resulting in depressed salaries and benefits. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 161–62, 167.[3] This is a critical distinc-

---

**2.** Contrary to the allegations in plaintiffs' brief, defendants ACGME and AAMC have filed answers to the complaint.

**3.** Interestingly, in an effort to make out long-arm jurisdiction, plaintiffs did attempt to suggest at oral argument on defendants' motion to dismiss that the tortious injury (if not the

antitrust injury) to plaintiffs was the Match itself but, in view of plaintiffs' complaint, the Court rejected the argument. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 136.

tion, because, as the Court noted in its February 11 Opinion and Order, if lawful acts are used as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful. *See id.* at 160–61. The Supreme Court has concluded that "[i]t is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." *American Tobacco Co. v. United States,* 328 U.S. at 809, 66 S.Ct. 1125. *See also Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. at 707, 82 S.Ct. 1404 ("acts which are in and of themselves legal lose that character when they become constituent elements of an unlawful scheme."). Accordingly, congressional confirmation that the Match program or participation in the Match program does not constitute a *per se* violation of the antitrust laws in the substantive provision of Section 207 does not defeat plaintiffs' antitrust claim.

The second sentence of Section 207(b)(2) goes on to provide, however, that "[e]vidence of any of the conduct described in the preceding sentence shall not be admissible in Federal court to support any claim or action alleging a violation of the antitrust laws." 15 U.S.C. § 37b(b)(2). Defendants argue that this provision prohibits plaintiffs from "us[ing] allegations related to the Match to support any antitrust claim, price-fixing or otherwise. Because plaintiffs' 'single' claim depends on evidence that defendant sponsored, conducted, or participated in the Match, Section 207 is fatal to their complaint, and it should be dismissed." Defs.' Mot. at 7. Plaintiffs respond to this charge in two ways.

First, plaintiffs argue that "[the February 11 Order and Opinion] upheld plaintiffs' price-fixing conspiracy claim without significant reliance on the allegations regarding the Match." Pls.' Opp. at 9–10. Accordingly, plaintiffs argue, the evidentiary prohibition does not defeat plaintiffs' claim. In support of this assertion, plaintiffs cite those portions of the February 11 Opinion in which the Court assessed the conspiracy claim as it relates to the AAMC and the ACGME and the allegations regarding the defendants' wage information and exchange and accreditation activities. *See id.* at 9. They argue that the Court focused not on the Match, but on the other prongs of the alleged conspiracy almost entirely. *See id.* at 9–10. In so arguing, however, plaintiffs fail to consider that the Court's conspiracy analysis entailed two steps, the first of which relied greatly on allegations related to the Match.

In considering the original Rule 12(b)(6) motions, the first question the Court asked was whether plaintiffs adequately had alleged that an antitrust conspiracy existed. In concluding that they had, the Court focused on the highly intertwined, three-pronged nature of the alleged conspiracy, and relied in large part on the primary role the Match allegations played in the conspiracy claim. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 162 (concluding that "plaintiffs adequately have alleged a common agreement ... among a number of the named organizational defendants *and those institutional defendants that participated in the Match Program* ") (emphasis added). In the second prong of the Rule 12(b)(6) analysis the Court assessed whether plaintiffs had alleged adequately that the individual defendants participated in the conspiracy. While the Court did then focus on the allegations of the individual defendant at issue—in the case of the AAMC, the allegations concerning the

COTH Survey; with respect to the ACGME, the allegations that related to that defendant's accreditation standards—such "individualized" analysis does not change the fact that the Court first had concluded that plaintiffs had alleged an intertwining three-pronged conspiracy with the Match at its core. Plaintiffs' assertion that the Court considered the claims of the AAMC and the ACGME without reference to the Match is simply incorrect.

■ Second, plaintiffs argue that "[e]ven without the Match allegations" the complaint satisfies "the three elements of a properly pleaded claim under Section 1 of the Sherman Act," Pls.' Opp. at 10–11, and that even without the Match-related allegations, the complaint still alleges a price-fixing conspiracy. *See id.* at 11. This argument is unsupported by the complaint that plaintiffs filed in this case, however. The complaint does not allege a price-fixing conspiracy but a single overarching integrated antitrust conspiracy with the Match as its centerpiece. *See* Compl. ¶¶ 3 (alleging three-pronged conspiracy), 58 (defendant class is defined in part by "all NRMP Institutional Participants"), 83–86 (alleging anticompetitive function of Match). Even the allegations that pertain to the ACGME accreditation standards rely in part on Match-related allegations. *See id.* ¶ 88(c) ("the ACGME encourages and/or requires participation in the NRMP as a condition of accreditation"). Plaintiffs' argument also is inconsistent with the Court's characterization of plaintiffs' claim in the February 11 Opinion and Order. *See Jung v. Association of American Medical Colleges,* 300 F.Supp.2d at 161–62; *see id.* at 166–67. In fact, plaintiff's current position is inconsistent with plaintiffs' own previous position as set forth in their earlier filings. In opposing NRMP's motion to

compel arbitration, for example, plaintiffs asserted that they allege:

a single, overarching conspiracy and the gravamen of plaintiffs' claim against NRMP is that it combined and conspired with others to displace competition in the market for resident services and to fix and stabilize residents' wages. The conspiracy which plaintiffs allege involves conduct significantly beyond particular features of the operation of the match program. While plaintiffs refer to certain conduct related to the operation of the match and its effects as *some evidence* of how the defendants carry out their overarching conspiracy to depress residents' wages, the complaint makes clear that the anticompetitive conduct related to the Match is not limited solely to the NRMP and that *the anticompetitive conduct related to the match necessarily interrelates with the other anticompetitive conduct alleged* . . . .

Plaintiffs' Consolidated Brief Opposing Defendants' Motion to Dismiss and to Compel Arbitration at 5 (underscore in original, italics added). *See also* Plaintiffs' Brief in Support of Their Motion for Certification of a Plaintiff Class and Certification of a Defendant Class at 2, 5.

Finally, while arguing with reference to the allegations related to the other two prongs of the alleged conspiracy that the conspiracy claim is legally sufficient without consideration of the Match-related claims, plaintiffs make no attempt to demonstrate that absent the Match allegations, the Court in fact would have come to the same conclusion that a conspiracy existed based solely on the remaining prongs. Moreover, the burden cannot be on the Court to effectively rewrite the complaint and consider it, as reconfigured, without the central Match-related allegations in order to evaluate plaintiffs' argument here.[4]

4. Nor would such an endeavor by the Court

be consistent with the February 11 Opinion

While there may be a "tree ... without the Match limb," Pls.' Opp. at 14–15, plaintiffs' conclusory argument does not convince the Court that it is so.[5] The Court concludes that the allegations concerning the Match and the institutional defendants' participation in the Match are so interdependent that the Court cannot separate them from the remaining allegations. Because Congress has prevented this or any other Federal court from considering evidence of Match-related conduct, the Court necessarily concludes that plaintiffs' complaint must be dismissed under 15 U.S.C. § 37b(b)(2).

### C. The "Savings" Clause

■ Plaintiffs next argue that notwithstanding the "evidentiary" prohibition of Section 207, the clause exempting price-fixing claims preserves their complaint. Section 207 provides that "[n]othing in this section shall be construed to exempt from the antitrust laws any agreement on the part of 2 or more graduate medical education programs to fix the amount of the stipend or other benefits received by students participating in such programs." 15 U.S.C. § 37b(b)(3). Plaintiffs interpret this clause to exclude from the antitrust exemption all claims that allege the price-fixing of resident wages, including their own. See Pls.' Opp. at 23. Plaintiffs construe this exclusion too broadly. Section 207 does not exclude all price-fixing claims related to resident compensation; it only excludes price-fixing claims that allege agreements between two or more institutional defendants to fix resident stipends and other benefits. There is a difference, and plaintiffs' complaint demonstrates that difference. Their pleading does not allege an agreement among residency programs to fix wages paid to residents. It alleges that an agreement exists between institutional defendants and numerous organizational defendants to suppress competition and depress compensation, and the allegations related to the organizational defendants—the Match Program, the AAMC dissemination of information, and the ACGME accreditation standards—comprise the heart of plaintiffs' claim. See Jung v. Association of American Medical Colleges, 300 F.Supp.2d at 161–62.

■ In an attempt to save their claim, plaintiffs also maintain that the Court must conclude that the savings clause is exempt from the evidentiary prohibition of Section 207, arguing that the restrictions on the admissibility of certain evidence in subsection (b)(2) cannot apply to price-fixing suits provided for in subsection (b)(3) because the subsection states that "nothing" in Section 207 shall provide ex-

---

and Order. See Jung v. Association of American Medical Colleges, 300 F.Supp.2d at 155 ("conspiracy allegations in antitrust cases cannot be compartmentalized and considered in isolation 'as if they were separate lawsuits, thereby overlooking the conspiracy claim itself'") (quoting In re Fine Paper Antitrust Litigation, 685 F.2d 810, 822 (3d Cir.1982)).

5. The Court's dismissal of the AMA in the February 11 Opinion and Order is irrelevant. Plaintiffs argue that "the Order shows—indeed establishes as the law of this case—that legal failure of one component of defendants' alleged conspiracy may lead to the dismissal of any defendant only involved in that component, but does not lead to the dismissal of the defendants involved in the remaining components." Pls.' Opp. at 13 (emphasis in original). Plaintiffs base this argument on the Court's conclusion that the single allegation regarding the FREIDA database, in the absence of any other allegations relating to AMA participation in the conspiracy, "[did] not lend support to an inference that the AMA participated in the alleged conspiracy." See Jung v. Association of American Medical Colleges, 300 F.Supp.2d at 169. The allegations concerning the Match program, by contrast, permeate the complaint and, as the Court concluded, serve as a cornerstone of the conspiracy. See id. at 162.

emptions from price-fixing claims. *See* Pls.' Opp. at 26. Again, plaintiffs misread the statute. Application of the evidentiary provision to the savings clause does not function to preclude the excepted price-fixing claims. Application of the provision merely forbids invocation of the Match program as evidence in any antitrust suit, including one involving allegations of price-fixing; but price-fixing claims unrelated to the Match as described in Section 207(b)(3) are not affected.

### D. Constitutional Challenges to Section 207

■ Plaintiffs understandably are frustrated. They won a significant victory in court; Congress now has snatched it away. As a result, they have spent a significant portion of their brief discussing the "highly peculiar" legislative path Section 207 took before its passage. Pls' Opp. at 17. They point out that there were no hearings, no testimony, no significant debate, and vigorous opposition from those few Senators and Representatives who cared enough or were importuned enough to focus on the Match legislation. *See id.* at 16–22. "By furtively attaching the Match Legislation as a rider to an unrelated bill on the eve of imminent passage rather than introducing legislation through normal procedures, defendants were able to avoid public and Congressional awareness and avoid opposition to their scheme." *Id.* at 21. As Bismarck suggested, "the making of laws, like the making of sausage, is something from which the fastidious person would often be well advised to avert his or her gaze." *ACLU v. Capitol Square Review Advisory Board,* 243 F.3d 289, 309 n. 21 (6th Cir. 2001); *Community Nutrition Institute v. Block,* 749 F.2d 50, 51 (D.C.Cir.1984) (same). Absent a valid constitutional challenge to a law passed by Congress and signed by the President, however, the responsibility of the courts is to interpret and apply the statute, not to second-guess. *See Mistretta v. United States,* 488 U.S. 361, 384, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) ("When this Court is asked to invalidate a statutory provision that has been approved by both Houses of Congress and signed by the President, ... it should only do so for the most compelling constitutional reasons.") (quoting *Bowsher v. Synar,* 478 U.S. 714, 736, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring)); *Nuclear Energy Institute, Inc. v. EPA,* 373 F.3d 1251, 1302 (D.C.Cir.2004) ("Congress has settled the matter, and we, no less than the parties, are bound by its decision.").

Plaintiffs challenge the constitutionality of Section 207 on several grounds. Upon consideration of the parties' arguments, the Court concludes that none of plaintiffs' arguments saves plaintiffs' conspiracy claim.

### 1. Separation of Powers

■ Plaintiffs charge that interpreting Section 207 to require disposition of this action in defendants' favor would amount to "a legislative adjudication of this pending case" in violation of "bedrock separation of powers principles" because "Congress may not ... direct decisions in pending cases." Pls.' Opp. at 28. Plaintiffs rely primarily on the Supreme Court's decision in *United States v. Klein,* 13 Wall. 128, 80 U.S. 128, 20 L.Ed. 519 (1871). *Klein* concerned a suit seeking proceeds from cotton seized from a Confederate sympathizer and sold by the Union army during the Civil War. The petitioner filed the suit pursuant to a federal statute that allowed recovery of seized property by owners if they provided proof of loyalty to the Union, which loyalty, the Court previously had determined, could be proven by evidence of a presidential pardon of the owner for any support he offered to the

Southern rebellion. *See id.* at 142–43, 13 Wall. 128. The owner of the cotton had received such a pardon. After petitioner had recovered in the Court of Claims, however, Congress passed another statute that precluded the use of any pardons given to those who participated in the rebellion to demonstrate proof of loyalty, and provided that acceptance of such a pardon in fact demonstrated *dis*loyalty. Congress also directed that upon presentation of proof of such a pardon, the Court of Claims and the Supreme Court must dismiss the property claim for want of jurisdiction. *See id.* at 143–44, 13 Wall. 128.

The Supreme Court found the statute unconstitutional in two respects. First, the Court determined that Congress is prohibited from "prescrib[ing] a rule for the decision of a cause in a particular way" in cases "pending before [the Judicial department of the government]." *United States v. Klein,* 80 U.S. at 146, 13 Wall. 128. As noted, the Court of Claims had already rendered judgment for the claimant, and an appeal had been taken to the Supreme Court. The Supreme Court found the statute at issue unconstitutional because it had the effect of forbidding the Supreme Court (and for the future, the Court of Claims) from "giv[ing] effect to the evidence which, in [the Court's] judgment, such evidence should have, and . . . direct[ing it] to give it an effect precisely [to] the contrary." *Id.* at 147, 13 Wall. 128. In so concluding, the Court distinguished those cases in which "new circum-

stances" are created under the statute that have the effect of determining the outcome of the case. *Id.* Second, the statute impaired the effect of the Presidential pardon and therefore infringed upon the constitutional power of the Executive. It was clear to the Supreme Court that "the legislature cannot change the effect of such a pardon any more than the executive can change a law [passed by the legislature]." *Id.* at 147–48, 13 Wall. 128.[6]

■ Plaintiffs argue that the evidentiary prohibition enacted by Congress with respect to the Match cannot stand under *Klein* because Congress "may not constitutionally assume the judicial function of determining the effect or weight to be given to evidence in a pending case" by altering the rules of decision such that the alteration directs disposition of the action in defendants' favor. *See* Pls. Opp. at 32.[7] As the D.C. Circuit has noted, "*Klein*'s exact meaning is far from clear." *National Coalition to Save Our Mall v. Norton,* 269 F.3d 1092, 1096 (D.C.Cir.2001). One thing is certain, however, and that is that "[w]hatever the precise scope of *Klein* . . . later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.' " *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 218, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). When "a statute 'compels changes in the law, not findings or results under old law,' it merely amends the underlying law, and therefore is not subject to a *Klein* chal-

---

6. As later explained by the Supreme Court, the statute at issue in *Klein* was unconstitutional in two respects: First, "it prescribed a rule of decision in a case pending before the courts, and did so in a manner that required the courts to decide a controversy in the Government's favor." Second, the statute infringed the constitutional power of the President to issue pardons. *United States v. Sioux Nation of Indians,* 448 U.S. 371, 404–05, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980).

7. Plaintiffs also argue that interpreting the substantive provision of Section 207 to require the disposition of this lawsuit in defendants' favor is unconstitutional. See Pls. Opp. at 30–31. In light of the Court's conclusion that Section 207 by its own terms does not direct judgment for defendants, *see* Section II.B, *supra,* the Court does not reach this argument.

lenge." *Imprisoned Citizens Union v. Ridge,* 169 F.3d 178, 187 (3d Cir.1999) (quoting *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 438, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992)). *See also Benjamin v. Jacobson,* 124 F.3d 162, 174 (2d Cir.1997) ("if legislation can be characterized as changing the underlying law rather than as prescribing a different outcome under pre-existing law, it will not violate the separation of powers principle formulated in *Klein* ").

 The Court concludes that by enacting the statute Congress changed the scope of permissible antitrust claims that may be resolved by the Federal courts. Congress exempted from antitrust prosecution all claims that directly challenge the legality of the Match and participation in the Match program by institutional defendants under the antitrust laws, and prohibited the use in antitrust actions of evidence concerning the Match Program and its participants. The plain language of the statute add a new antitrust exemption to the antitrust laws and new procedural or evidentiary restrictions on the prosecution of certain antitrust actions. *See* 15 U.S.C. § 37b(b)(2).[8] This change in or amendment to applicable antitrust law does not, however, prescribe a different finding, conclusion or result in the outcome of this or any other particular antitrust case. It therefore does not run afoul of *Klein.*

The line between a statute that provides the standard to which courts must adhere and a statute that compels a specific result in a pending action at times is difficult to draw. *See Benjamin v. Jacobson,* 124 F.3d at 174 ("The distinction may in some cases be hard to discern."); *Axel Johnson Inc. v. Arthur Andersen & Co.,* 6 F.3d 78, 81 (2d Cir.1993) ("The conceptual line between a valid legislative change in law and an invalid act of adjudication is often difficult to draw."). In this case, however, the line is clear, and the fact that Section 207 has application to actions beyond this lawsuit only bolsters the Court's conclusion that the statute was amended. Section 207 precludes both claims challenging the antitrust status of the Match Program itself, and the consideration of evidence related to the Match Program in actions brought under the antitrust laws. Accordingly, the Court concludes that plaintiffs can find no refuge in *Klein* and its articulation of the separation of powers doctrine.

### 2. Unconstitutional Taking

 Plaintiffs next argue that dismissal of their complaint under the evidentiary prohibition of Section 207 would constitute an unlawful taking in violation of the Fifth Amendment. Specifically, plaintiffs argue that with dismissal they will lose their property interest in their future wages and working conditions. *See* Pls.' Opp. at 36. These lost increased wages and bettered working conditions can only be considered "lost," however, if plaintiffs succeed in this action and wages in fact are increased. Otherwise, there is no basis on which to assume that compensation would increase in the future. The court of appeals has made it clear that plaintiffs have no property interest in their pending

---

**8.** Despite arguments to the contrary, the statute is not merely a confirmation of prior existing law, the titles of Section 207, "Confirmation of Antitrust Status of Graduate Medical Resident Matching Programs," and of subsection (b)(2), "Confirmation of Antitrust Status," and the articulated purpose of subsection (a)(2)(A) notwithstanding. "The title of a statute '[is] of use only when [it] sheds light on some ambiguous word or phrase' in the statute itself." *Carter v. United States,* 530 U.S. 255, 267, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (quoting *Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (internal quotation omitted)) (brackets in original). Here, the statute is unambiguous.

claim. Causes of actions only become actionable property interests upon the entry of final judgment. *Adams v. Hinchman,* 154 F.3d 420, 424 (D.C.Cir.1998) (a cause of action "affords no definite or enforceable property right until reduced to a final judgment"); *Grimesy v. Huff,* 876 F.2d 738, 744 (9th Cir.1989) ("a party's property right in any cause of action does not rest until a final *unreviewable* judgment is obtained.") (internal quotations and citation omitted) (emphasis in original). Similarly, to the extent that plaintiffs implicitly assert that dismissal of their complaint would constitute a taking in the form of past wage loss stemming from defendants' anticompetitive behavior, those asserted losses likewise are compensable, if at all, only upon entry of a final judgment.

### 3. Additional Constitutional Arguments

■ Plaintiffs also argue that dismissal of their antitrust claim through the evidentiary restriction of Section 207 would violate their right to due process, their right to access to the courts and their right to equal protection of the laws. Plaintiffs first raise a due process claim under *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), asserting that "exclusion of this concededly relevant evidence would result in summary dismissal of plaintiffs' entire claim at the *pleading* stage," thereby denying them the right to adjudication on the merits. Pls.' Opp. at 33 (emphasis in original). The Supreme Court in *Logan* did not conclude that litigants have a due process right to an adjudication on the merits, however. Instead, the Court concluded that it was a denial of due process to create a cause of action in which parties have a property right and then to allow the state to take that right away without providing the party with any judicial forum. *See id.* at 429–30, 102 S.Ct. 1148. This case does not present the same situation, and plaintiffs'

reliance on *Logan* therefore is misplaced. Section 207 does not deny plaintiffs a forum in which to bring their claim. Instead, the statute restricts the basis for an antitrust cause of action, which is not an unconstitutional restriction so long as there is a rational basis for the law, as the Court discusses, *infra* at Section II.D.3.

■ Plaintiffs similarly argue that the evidentiary prohibition unconstitutionally prescribes their right to access to the courts under the First Amendment. The constitutional right of access is predicated on the existence of an underlying claim, however. If the cause of action no longer exists, the right to access cannot save the claim. As the Supreme Court concluded in *Christopher v. Harbury,* 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002):

> Whether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong. However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court.

*Id.* at 414–15, 122 S.Ct. 2179. Here, plaintiffs assert that dismissal of the complaint under Section 207 effectively denies plaintiffs access to the courts to adjudicate their claim. A more proper construction of the effect of the statute is that it effectively eliminates the cause of action in the first instance. Plaintiffs' "access to the courts" argument therefore is misplaced. Whether the congressional act was constitutional is a separate question, to be discussed, *infra* at Section II.D.3.

Plaintiffs next argue that the evidentiary prohibition fails to comport with due process because "a special evidentiary rule that applies only to litigants who seek to include in their cases evidence relating to a matching program—one that applies regardless of the merit of those litigants' claims—is an archetype of irrational legislation." Pls.' Opp. at 36. As a preliminary matter, the Court notes that there is a "strong deference accorded legislation in the field of national economic policy," Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), and "Congress has considerable leeway to fashion economic legislation." Eastern Enterprises v. Apfel, 524 U.S. 498, 528, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). As the Supreme Court has concluded, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Eastern Enterprises v. Apfel, 524 U.S. at 524, 118 S.Ct. 2131 (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Accordingly, the Court must assess whether the Congress acted in an arbitrary and irrational way in enacting the evidentiary prohibition of Section 207. Upon review of the policies expressly articulated in the statute, the Court concludes that it did not.

Subsection (a) of Section 207 articulates the congressional findings, purposes and intent justifying the exclusion of the Match Program and participation in the Match from the purview of the antitrust laws, both in actions against the program and its participants and in actions that more generally seek to demonstrate violation of the antitrust laws by making allegations concerning the Match. The subsection first references the historical impetus for the creation of the Match, which include a desire for efficiency, for fairness and for protection of students' early years of medical school. See 15 U.S.C. § 37b(a)(1)(A)-(D). The statute then provides:

> Antitrust lawsuits challenging the matching process, regardless of their merit or lack thereof, have the potential to undermine this highly efficient, pro-competitive, and long-standing process. The costs of defending such litigation would divert the scarce resources of our country's teaching hospitals and medical schools from their crucial missions of patient care, physician training, and medical research. In addition, such costs may lead to abandonment of the matching process, which has effectively served the interests of medical students, teaching hospitals, and patients for over half a century.

15 U.S.C. § 37b(a)(1)(E). The intent behind the enactment of Section 207 was to secure the continuation of the Match itself, which Congress found is an efficient, valuable placement system, and to protect the financial resources of teaching hospitals and programs from costs of antitrust litigation that concern the Match program. The Court cannot conclude that this protection, effectuated by exempting the Match or its participants from antitrust prosecution, is an irrational or arbitrary act on the part of Congress.

Furthermore, if Congress's specific intent was to prevent use of funds in lawsuits that challenge the Match either directly or indirectly under the antitrust laws, the evidentiary prohibition is a rational means of actualizing that protection of resources. The fact that application of the statute effectively will end this litigation does not make the law irrational or arbitrary. See National Coalition to Save Our Mall v. Norton, 269 F.3d at 1097

(Congress may enact legislation that affects pending actions so long as it does so by amending the relevant law); *Deck v. Peter Romein's Sons, Inc.*, 109 F.3d 383, 386 (7th Cir.1997) ("Congress' power to effect a change in the law and to make that change controlling as to pending cases is beyond peradventure."); *National Juvenile Law Center, Inc. v. Regnery*, 738 F.2d 455, 465 (D.C.Cir.1984) ("Pending cases are often affected by the actions of coordinate branches of government. For instance, the general rule is that, if Congress changes the law while a case is pending, the courts are obligated to apply the law as they find it at the time of judgment (including appellate judgment).").

 This reasoning also disposes of any additional argument that retroactive application of the statute to this action violates plaintiffs' due process rights. It cannot be disputed that Congress intended that Section 207 apply to this action. *See* 15 U.S.C. § 37b(c) ("[t]his section . . . shall apply to all judicial and administrative actions or other proceedings pending on [the] date of enactment"). The Court therefore must ask whether "the retroactive application of a statute [is] supported by a legitimate legislative purpose furthered by rational means." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. at 729, 104 S.Ct. 2709. The policies articulated by Congress in Section 207(a) ("Findings and Purposes") provide the bases for the conclusion that retroactive application of the statute is a rational means to effect these purposes. With Section 207, Congress intended to protect the Match Program and its participants from the cost of defending antitrust actions that challenge the Match. Clearly, this lawsuit is such an action, and application of the statute to this action accomplishes Congress's goal of conserving the resources of the medical education community. While

plaintiffs disagree with many of the "findings" of Congress, particularly because they were made without the benefit of any congressional hearings, *see supra* at Section II.D, and question the policies underlying the statute, the findings themselves are not irrational and there is a rational connection between the findings made and the policies enacted. *See Hammond v. United States*, 786 F.2d 8, 13 (1st Cir.1986) (plaintiff has not met burden of showing that statute is "arbitrary and irrational in purpose and effect" and not "reasonably related to a legitimate congressional purpose").

 Plaintiffs raise a similar claim that Section 207 violates their equal protection rights. As the Supreme Court provided in *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), however, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . Where there are 'plausible reasons' for Congress' action, 'our inquiry is at an end.'" *Id.* at 313, 113 S.Ct. 2096 (internal quotations and citations omitted). In the absence of any argument that plaintiffs are members of a suspect class or that their claim asserts infringement of a constitutional right, plaintiffs' equal protection argument fails on the same basis as did their due process claim. *See Calloway v. District of Columbia*, 216 F.3d 1, 8–9 (D.C.Cir.2000) (where plaintiffs are not members of suspect class, equal protection challenge is reviewed under rational basis standard); *Hammond v. United States*, 786 F.2d at 15 (failing to allege a suspect class, plaintiffs' equal protection argument fails on same basis as due pro-

cess analysis). And "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.' ... [C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 319, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. at 318, 113 S.Ct. 2096).

## III. CONCLUSION

For the foregoing reasons, in view of the enactment of Section 207 by Congress, the Court concludes that with respect to the 14 defendants that have filed answers it must grant their motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, and, with respect to the remaining 15 movants it must treat their motion as a motion for failure to state a claim under Rule 12(b)(6) and grant that motion. The Court will deny all other pending motions as moot.[9] A separate Order consistent with this Opinion will issue this same day.

SO ORDERED.

## *ORDER AND JUDGMENT*

For the reasons stated in the separate Opinion issued this same day, it is hereby

ORDERED that the motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure [259] is GRANTED with respect to the 14 defendants that have filed answers; it is

FURTHER ORDERED that with respect to the remaining 15 movants that have not yet filed answers, the motion for judgment on the pleadings shall be treated as a motion to dismiss for failure to state a

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and it is GRANTED; it is

FURTHER ORDERED that defendant National Resident Matching Program's motion to strike plaintiffs' statement [190] is DENIED as moot; it is

FURTHER ORDERED that defendant National Resident Matching Program's motion to strike plaintiffs' response opposing defendant NRMP's motion for protective order [191] is DENIED as moot; it is

FURTHER ORDERED that the consent motion for entry of a stipulated order on experts' discovery [201] is DENIED as moot; it is

FURTHER ORDERED that plaintiffs' motion for class certification [205] is DENIED as moot; it is

FURTHER ORDERED that defendants' motion to compel class discovery [223], [225] is DENIED as moot; it is

FURTHER ORDERED that plaintiffs' motion to amend or correct order staying class discovery [234] is DENIED as moot; it is

FURTHER ORDERED that plaintiffs' motion for a protective order [235] is DENIED as moot;

FURTHER ORDERED that plaintiffs' amended motion for class certification [238] is DENIED as moot; it is

FURTHER ORDERED that defendant National Resident Matching Program's motion to stay proceedings pending appeal [239] is DENIED as moot; it is

FURTHER ORDERED that certain defendants' motion for a certificate of appealability [241] is DENIED as moot; it is

---

9. Had the Court not granted the instant motion, it would have granted the motion of

certain defendants to certify an immediate appeal under 28 U.S.C. § 1292(b).

FURTHER ORDERED that defendants' motion to stay proceedings pending appeal [243] is DENIED as moot; it is

FURTHER ORDERED that plaintiffs' motion to amend the complaint [248] is DENIED as moot; it is

FURTHER ORDERED that certain defendants' motion to reconsider the Rule 12(b)(2) jurisdiction ruling [260] is DENIED as moot; it is

FURTHER ORDERED that judgment on the pleadings is entered for defendants and the case is DISMISSED for failure to state a claim; and it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case. This is a final appealable order. *See* Rule 4(a), Fed. R.App. P.

SO ORDERED.